***NOT FOR PUBLICATION***
UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

KENNETH W. JEANSONNE,                CIVIL ACTION
          Appellant                  NO. CV07-1329-A

VERSUS

MICHAEL J. ASTRUE, COMMISSIONER      JUDGE DEE D. DRELL
OF SOCIAL SECURITY,                  MAGISTRATE JUDGE JAMES D. KIRK
          Appellee


REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Kenneth W. Jeansonne ("Jeansonne") filed an application for supplemental security income ("SSI") on June 29, 2004, alleging a disability onset date of December 18, 1992 (Tr. p. 90), due to high blood pressure, breathing problems, poor vision, depression, and emotional problems (Tr. p. 61). That application was denied by the Social Security Administration ("SSA") (Tr. p. 61).

A de novo hearing was held before an administrative law judge ("ALJ") on December 12, 2005, at which Jeansonne appeared with his attorney and a vocational expert ("VE"). The ALJ found that, although Jeansonne suffers from "severe" impairments, including depressive disorder, left ventricular hypertrophy with shortness of breath, and high blood pressure, he has the residual functional capacity to perform light work except for limitations in his ability to balance, climb, and work around heights, dangerous machinery, or respiratory irritants, and he can only perform work limited to one or two step instructions and have only occasional interaction with supervisors and co-workers. The ALJ further found

that, since Jeansonne is a younger individual with a high school education who can perform a significant range of light work, there are a significant number of jobs Jeansonne can perform in the national economy, such as small products assembler, press operator in a laundry, and garment folder, and therefore Jeansonne was not under a disability within the meaning of the Social Security Act at any time through the date of the ALJ's decision on February 7, 2006 (Tr. pp. 57-58).

The Appeals Council reviewed the ALJ's decision and remanded the case to the ALJ, ordering the ALJ to obtain additional evidence concerning Jeansonne's physical impairments, including (if warranted) a consultative internal medical examination with pulmonary function studies and medical source statements about what the claimant can still do despite his impairments (Tr. pp. 86-87).

On remand, a supplemental hearing was held on June 15, 2006, at which Jeansonne appeared with his attorney and a VE (Tr. p. 335).  The ALJ found that, although Jeansonne suffers from severe obesity, depressive disorder, hypertension, breathing problems, coronary artery disease, and foot problems (Tr. p. 17), he has the residual functional capacity to lift/carry ten to twenty pounds, stand/walk for four hours in an eight hour day, sit for six hours in an eight hour day if he has a sit/stand option, and occasionally stoop, crawl, crouch, balance, and kneel, but cannot climb ladders, and cannot work around dangerous heights, machinery, or dust, fumes, or gases due to shortness of breath (Tr. pp. 18-19).  The ALJ concluded that, although Jeansonne is unable to perform his

2

past relevant work as a survey rod man, he can perform other work which exists in significant numbers in the national economy such as assembly line worker, dispatcher, and food order clerk, and has not been under a disability as defined in the Social Security Act at any time through the date of the ALJ's decision on March 22, 2007 (Tr. pp. 21-23).

Jeansonne again requested a review of the ALJ's decision, but the Appeals Council declined to review it, and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Jeansonne next filed this appeal seeking judicial review of the ALJ's decision.   Jeansonne raises the following issues for review on appeal:

> 1. The ALJ failed to properly evaluate all of Jeansonne's medically determined impairments, resulting in a finding at Step 3 of the evaluation process that was unsupported by the totality of the evidence.
>
> 2. The Vocational Expert's testimony cannot constitute substantial evidence of non-disability.

<u>Summary of Pertinent Facts</u>

At the time of the ALJ's March 2007 decision, Jeansonne was 46 years old, had a high school education, and had past relevant work experience as a survey rod man (Tr. p. 21).

1. Medical Records

In November 2002, Jeansonne complained of shortness of breath for two days (Tr. p. 131).   An ECG in November 2002 was abnormal, showing a normal sinus rhythm, but a right bundle branch block and left ventricular hypertrophy (Tr. p. 136).   An x-ray of Jeansonne's

3

chest showed no signs of active cardiac, pulmonary or osseous abnormalities (Tr. p. 135). A barium enema administered in November 2002 was also negative (Tr. p. 134). A stress EKG in January 2003 was terminated early due to fatigue (Tr. pp. 130-132).

Jeansonne was evaluated in August 2004 by Dr. Amita Toprani, an internist (Tr. pp. 140-142). Dr. Toprani noted Jeansonne was six feet tall, weighted 251 pounds, and smoked a pack of cigarettes a day (Tr. p. 141). Dr. Toprani also noted Jeansonne was short of breath at rest, had visual acuity of 20/70 on each side with correction, had hypertension but no evidence of end organ damage, had chest pain that may or may not be consistent with angina, and suffered from depression with a grossly normal mental status (Tr. pp. 141-142).

_____From 1993 through 2004, Jeansonne was treated at the Mental Health Center for depression (Tr pp. 143-153). In 2004, Jeansonne complained of problems sleeping, with sleep apnea, with snoring, and getting along with others (Tr. p. 143). Jeansonne was found to have low self esteem, no social skills, and poor coping skills to manage situational stressors (Tr. p. 145). Jeansonne was diagnosed at Axis I with dysthymic disorder,[1] at Axis II with personality disorder and antisocial/borderline, at Axis III, hypertension and

_____

[1] The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client. Axis I refers to clinical syndromes, Axis II to developmental disorders and personality disorders, Axis III to physical disorders and conditions, Axis IV to psychosocial stressors, and Axis V to the global (overall) assessment of functioning. Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-35 (4th ed. 2000) ("DSM-IV-TR").

sleep apnea, at Axis IV with multiple situational stressors, and at Axis V with a GAF score of 65.[2]  Jeansonne was prescribed Paxil and Trazadone (Tr. p. 151).  A 2004 Mental Residual Functional Capacity Assessment noted Jeansonne has moderate limitations in (1) the

---

[2] The Global Assessment of Functioning, or GAF, score represents Axis V of the Multiaxial Assessment system.  The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client.  Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-30 (4th ed. 2000) ("DSM-IV-TR").  GAF is a standard measurement of an individual's overall functioning level.  The GAF score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning with respect to psychological, social and occupational functioning, on a hypothetical continuum of mental health-illness.  The first number indicates the patient's current GAF, while the second number indicates the highest score reported in the previous year.  DSM-IV-TR at 32-34.  The GAF scale goes from 0-100: **91-100** - superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities, no symptoms; **81-90** - absent or minimal symptoms, good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns; **71-80** - if symptoms are present, they are transient and expectable reactions to psycho-social stressors, not more than slight impairment in social, occupational, or school functioning; **61-70** - some mild symptoms OR some difficulty in social, occupational or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships; **51-60** - moderate symptoms OR moderate difficulty in social, occupational, or school functioning; **41-50** - serious symptoms OR serious impairment with social, occupational, or school functioning; **31-40** - some impairment in reality testing or communication OR major impairment in several areas such as work or school, family relations, judgment, thinking, or mood; **21-30** - behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgement OR inability to function in almost all areas; **11-20** - some danger of hurting self or others OR occasionally fails to maintain minimal personal hygiene OR gross impairment in communication; **1-10** - persistent danger of severely hurting self or others OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death; and **0** - inadequate information.  DSM-IV-TR, at 34.  Also, Boyd v. Apfel, 239 F.3d 698 (5th Cir. 2001).

ability to understand and remember detailed instructions, (2) the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, (3) the ability to sustain an ordinary routine without special supervision, (4) the ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, (5) the ability to interact appropriately with the general public, and (6) the ability to set realistic goals or make plans independently of others (Tr. pp. 154-156).  A 2004 Psychiatric Review Technique Form noted the medical disposition was based on Listing 12.04, Affective Disorders, for which Jeansonne had a disturbance of mood accompanied by a full or partial manic or depressive syndrome, as evidenced by major depression disorder, moderate limitations in restriction of activities of daily living, moderate difficulties in maintaining social functioning, and a mild limitation in maintaining concentration, persistence, or pace (Tr. pp. 158-170).

Jeansonne underwent a psychological evaluation in October 2004.  The results of the Minnesota Multiphasic Personality Inventory-Second Edition (MMPI-2) test were considered invalid due to "gross over-endorsement by the patient of very rare symptoms, as well as a wide variety and extreme intensity of symptoms," nearly every basic clinical and content scale score was elevated, most to a high degree, and the results were inconsistent with Jeansonne's presentation during interview and his clinical history (Tr. pp.

6

181-182).  On the Thematic Apperception Test ("TAT"), Jeansonne was negative for major depression, excessive anxiety, PTSD, psychosis, and active bipolar symptoms, but he was found to be dependent on his mother (Tr. p. 182).  On the Structured Interview of Reported Symptoms ("SIRS"), all of Jeansonne's scores were in the range indicating he was feigning a mental disorder, with Jeansonne producing markedly elevated scores on two scales, Subtle Symptoms and Severity of Symptoms, and moderately elevated scores on the remaining six scales, Rare Symptoms, Symptom Combinations, Improbable/Absurd Symptoms, Blatant Symptoms, Selectivity of Symptoms, and Reported vs. Observed Symptoms (Tr. p. 182).

The clinical psychologist, Yolanda Rambin, Ph.D., concluded that Jeansonne was feigning a mental disorder, but diagnosed depressive disorder, NOS, secondary to current psychosocial stressors and a history of being a childhood victim of domestic violence by this father which contributed to his hypersensitivity, paranoia around others, anger, and irritability, a personality disorder, NOS with dependent features, and a history of alcohol abuse (Tr. p. 183).  Jeansonne was referred for counseling, and it was recommended that medication management of his symptoms be de-emphasized (Tr. p. 183).  In 2005, Jeansonne was prescribed Wellbutrin and Trazadone (Tr. p. 184).

In April 2005, a pulmonary function study suggested restrictive ventilatory impairment (Tr. p. 234).  Lung volume and spirometry studies indicated Jeansonne has moderate obstructive airways disease (Tr. pp. 235-237).  Also in April 2005, an

7

echocardiogram showed a moderately enlarged left ventricular cavity, a moderately severe LVH, and a mildly dilated left atrium, and indicated diastolic dysfunction (Tr. p. 238-239).

In May 2006, Jeansonne underwent a nuclear stress test which was "probably normal" (Tr. pp. 190, 192), and a myocardial perfusion which showed an ejection fraction of 51% (Tr p. 191).

In June 2006, Jeansonne was diagnosed with radiculopathy due to pain in his feet and prescribed Neurontin (Tr. p. 189).

An echocardiogram in July 2006 showed sinus tachycardia, a moderately enlarged left ventricular cavity, a mildly dilated left atrium, moderately severe LVH (left ventricular hypertrophy), and hyperdynamic LV (left ventricle) which was near obliteration at rest (Tr. p. 186). Jeansonne was diagnosed with hypertension, obesity, lipidemia (high blood cholesterol and triglycerides), and coronary artery disease (Tr. p. 188).

In August 2006, an evaluation by Dr. Christina Levings, an internist and gastroenterologist, showed Jeansonne was obese, had corrected vision of 20/70 in each eye, and mild tachypnea[3] at rest which increased with activity (Tr. pp. 285-289). Jeansonne's significant history of tobacco and the possibility that his pulmonary problems were due to COPD were noted (Tr. p. 287). Jeansonne's complaints of pain and numbness in his feet were noted,

---

[3] MEDLINEplus Health Information, Medical Encyclopedia: Tachypnea, *available at* http://www.nlm.nih.gov/medlineplus/encyclopedia.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

but his feet and lower extremities were unremarkable and he had a normal neurological exam and good arterial flow to his lower extremities, so the etiology of his pain was unclear (Tr. p. 287). Jeansonne's hypertension was noted to be controlled by medications (Tr. p. 287). Finally, Dr. Levings noted that Jeansonne's chest pain could have a component of COPD (Tr. p. 287); on review of his recent cardiology tests, the physician noted that, although Jeansonne had a right bundle branch block, there was no evidence of ischemia and he had a normal sinus rhythm, so it was unclear whether Jeansonne's chest pain was cardiac in nature and further testing was recommended (Tr. p. 288).

In a residual functional capacity analysis, Dr. Levings found Jeansonne can lift/carry ten pounds occasionally (up to one-third of the time) and less than ten pounds frequently (up to two-thirds of the time), stand/walk at least two hours in an eight hour day, has no limitations on sitting, pushing/pulling, reaching, handling, fingering, and feeling, has limited vision, and can occasionally (up to one-third of the time) climb, balance, kneel, crouch, crawl or stoop (Tr. pp. 289-291). Dr. Levings stated that Jeansonne's postural limitations are due to shortness of breath and that his visual acuity of 20/70 with correction represents a significant impairment (Tr. pp. 290-291).

Finally, in April 2007, Jeansonne was seen again for pain in his feet, which was diagnosed as neuropathy and his prescriptions for Neurontin and Ultram were refilled (Tr. p. 294). A report[4]

---

[4] The author of the report is unknown.

also noted that Jeansonne was "unable to stand for short periods of time due to pain" and was "disabled from work" (Tr. p. 294).

### 2. November 2005 Hearing

Jeansonne testified at his 2005 hearing that he was 45 years old, weighed 265 pounds, was left handed, lived by himself, had a high school education, and past relevant work as a survey rod man (1979-1985, 2000) and doing carpentry work part time with his father (Tr. pp. 299-301). Jeansonne testified he became disabled in 1992 due to depression (Tr. p.305). Jeansonne also testified that he was incarcerated for thirty days in 2003 or 2004 for DWI (Tr. p. 303).

Jeansonne testified that he lives alone, his mother supports him, and he receives food stamps (Tr. p. 304-305). Jeansonne's parents visit him sometimes, and he visits them (Tr. pp. 316-317). Jeansonne further testified that he and his father have never gotten along very well, but he and his mother get along well (Tr. p. 317). Jeansonne has two brothers, one of whom he has not seen for at least fifteen years and the other of whom he sees when they get together at their parents's house for holidays (Tr. pp. 317-318). For meals, Jeansonne has sandwiches, eats fast food, or eats at his parents' house (Tr. p. 318). Jeansonne does not spend time outdoors and does not get any exercise (Tr. p. 319). Jeansonne testified that he usually goes to bed when it gets dark outside and sleeps two to three hours at night, he smokes a pack of cigarettes a day, does light grocery shopping, watches television, and takes care of his personal hygiene (Tr. pp. 305-306, 319).

Jeansonne testified that he suffers from depression and feelings of worthlessness, his feet hurt even when he sits, he has varicose veins in his legs, his legs hurt, he gets out of breath easily, he has chest pain, and he feels like he cannot move or do anything anymore (Tr. pp. 307-308, 320). Jeansonne wears contact lenses (Tr. p. 309). Jeansonne also suffers from sleep apnea which wakes him up at night, then he has trouble falling asleep again (Tr. p. 319). Jeansonne has trouble concentrating, gets confused about what he should do, and has trouble remembering things (Tr. p. 320). He drives occasionally, can see the television, and can read a newspaper (Tr. p. 310). Jeansonne testified that he does not have any hobbies, but he used to hunt and fish (Tr. p. 320).

Jeansonne testified that he is depressed because he cannot get along with people and does not have any friends (Tr. p. 312). Jeansonne testified the people he used to work with did not seem to like him (Tr. p. 314), he has always had a problem getting along with people, and he tends to withdraw socially (Tr. p. 315). Jeansonne testified he has been going to the mental health clinic off and on since about 1992, and monthly for at least the last year and a half (Tr. pp. 321-322, 324). Jeansonne also testified that he completed his period of probation for DWI and had stopped drinking alcohol (Tr. p. 322).

Jeansonne testified that he takes Neurontin daily for pain in his feet, Wellbutrin for depression, and medication to help lower his cholesterol (Tr. pp. 322-323).

Finally, Jeansonne testified he can probably lift 50 pounds,

cannot really push or pull, and cannot stand or walk for six hours (Tr. pp. 324-325). Jeansonne testified he does not use a walking aid, but his balance is not very good (Tr. p. 325). Jeansonne testified he is always tired and out of breath and does not sleep well (Tr. p. 326).

The VE testified that Jeansonne's past relevant work as a rod man (surveyor helper) was medium, unskilled work (Tr. pp. 327-329). The VE further testified, in response to a hypothetical question involving an individual of Jeansonne's age, education, and work experience, who is able to lift 50 pounds, stand six hours, walk six hours, has a limited ability to balance, cannot climb ladders or scaffolds, cannot work around dangerous heights or moving machinery, and cannot be exposed to dust, fumes or gases, that such a person could not do his past relevant work as a surveyor's helper (Tr. pp. 329-330), but could work as a gate guard (light work) (Tr. pp. 331-331). The VE also testified that, if the individual was limited to light work (20/10 pounds), with only a limited ability to balance, no working around heights, moving machinery, gasses, dust or fumes, only occasional interaction with co-workers and supervisors, and simple one and two step instructions, such a person could not do his past relevant work as a surveyor helper, but could work as a small products assembler, a press operator in a laundry, or a garment folder (Tr. pp. 331-333). In response to a third hypothetical, which gives full credibility to every disability and impairment as testified to by Jeansonne, the VE testified there were no jobs such a person could perform (Tr. pp.

12

332-333).

### 3. June 2006 Hearing

At Jeansonne's second administrative hearing, Jeansonne appeared with his attorney and a VE.  Jeansonne testified he had been receiving mental health care sporadically since 1996 or 1997 and monthly since 2004 (Tr. pp. 341-342).  Jeansonne testified that he takes Neurontin to relieve the pain in his feet caused by neuropathy, but that it does not help very much (Tr. p. 343).  For shortness of breath, Jeansonne takes Albuterol (Tr. p. 348); he does not use a breathing machine for his sleep apnea (Tr. p. 354).

Jeansonne testified that he receives medical care at Huey P. Long Hospital, and usually sees Dr. Godley in the cardiology clinic and Dr. Jackson in the neurology clinic (Tr. p. 345-346).

The VE testified that Jeansonne's past relevant work as a survey rod man was medium, semiskilled work (Tr. p. 350). Jeansonne testified that working as a survey rod man involved walking a lot (Tr. p. 351).  Jeansonne testified that he no longer drinks alcohol and smokes less (about half a pack a day) since he had pneumonia in 1998 (Tr. p. 353).  Jeansonne testified he cannot work because of the pain in his feet if he stands more than twenty or thirty minutes, he does not sleep well at night, and his leg and ankle hurt (Tr. p. 354).

The ALJ posed a hypothetical involving a 45 year old individual with a high school education, able to read, write, do math, with a work history as a lineman, who can lift and carry ten to twenty pounds, occasionally stoop, crouch, crawl, squat, kneel,

and balance, can climb stairs but not ladders or scaffolds, cannot work at dangerous heights, around dangerous machinery, or around dust, fumes or gases, needs to be able to alternate his posture between sit and stand, and can do sedentary level work, can follow short, simple instructions, can maintain concentration and persistence, and can have only limited interaction with the general public and coworkers (Tr. pp. 355-356). The VE testified that such an individual can do assembly line work (sedentary, 2000 jobs in Louisiana, 175 jobs in the nation), work as a dispatcher or routing clerk (sedentary, 3000 jobs in Louisiana, 175,000 jobs in the nation), or work as a food order clerk (sedentary, 2500 jobs in Louisiana, 246,000 jobs in the nation) (Tr. p. 356). The VE admitted the job numbers for Louisiana had probably changed since Hurricanes Katrina and Rita, but that he did not have any updated information (Tr. p. 359).

## Law and Analysis

To qualify for SSI benefits, a claimant must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1381(a). Eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. § 1382(a). To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than 12 months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 42 U.S.C. §

1382(a)(3).

ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a).  The sequential process required the ALJ to determine whether Jeansonne (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work.  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled.  Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy.  Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Jeansonne has not engaged in substantial gainful activity since 2000 (Tr. p. 17), and

that he has a severe impairment of obesity, depressive disorder, hypertension, breathing problems, coronary artery disease, and foot problems (Tr. p. 17), but that he does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. p. 18).   The ALJ also found that Jeansonne is unable to perform his past relevant work as a survey rod man (Tr. p. 21).

At Step No. 5 of the sequential process, the ALJ further found that Jeansonne has the residual functional capacity to lift/carry ten to twenty pounds, stand/walk for four hours in an eight hour work day, sit for six hours in an eight hour work day if he has a sit/stand option, occasionally stoop, crawl, crouch, balance, and kneel, although he cannot climb ladders, and cannot work around dangerous heights, machinery or dust, fumes, or gases due to shortness of breath (Tr. pp. 18-19).   The ALJ further found that Jeansonne is a younger (46 year old) individual with at least a high school education (Tr. p. 21).

The ALJ concluded that Jeansonne can perform other work which exists in significant numbers in the national economy such as assembly line worker, dispatcher, and food order clerk, and has not been under a "disability" as defined in the Social Security Act at any time through the date of the ALJ's decision on March 22, 2007 (Tr. pp. 21-23).

Issue No. 1 - Jeansonne's Impairments

Jeansonne contends the ALJ failed to properly evaluate all of his medically determined impairments, resulting in a finding at

16

Step 3 of the evaluation process that was unsupported by the totality of the evidence.  Specifically, Jeansonne contends the ALJ failed to consider (1) medical evidence of a significant impairment to his visual acuity, (2) medical evidence of severe respiratory and cardiovascular impairments, (3) whether Jeansonne's combination of impairments met or medically equaled a listing for cardiovascular impairments under Section 4.00 or a listing for respiratory impairments under Section 3.00, and (4) the cumulative effects of Jeansonne's obesity on his cardiovascular impairment.

1.

Jeansonne's visual acuity is 20/70 with correction.  The ALJ stated this was only a "slight abnormality" which had only "minimal impact on the individual so that it would not be expected to interfere with his ability to do work" (Tr. p. 18).  The ALJ's conclusion is contrary to the medical evidence; Dr. Levings specifically stated that visual acuity of 20/70 with correction represents a significant impairment (Tr. pp. 290-291).

The ALJ erred in substituting her opinion for that of the medical doctor.  ALJ's have been warned by the courts against "playing doctor" and making their own independent medical assessments.  Frank v. Barnhart, 326 F.3d 618 (5th Cir. 2002). The Regulations define a non-severe impairment as an impairment or combination of impairments that do not significantly limit a claimant's physical or mental ability to do basic work activities. "Basic work activities" means physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or

17

handling, capacities for seeing, hearing, and speaking, understanding, carrying out, and remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting.  20 C.F.R. § 404.1521, 20 C.F.R. § 416.921. An impairment can be considered as not "severe" only if it is a slight abnormality which has such a minimal effect on the claimant that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience. Estran v. Heckler, 745 F. 2d 340, 341 (5th Cir. 1984).  See also, Anthony v. Sullivan, 954 F.2d 289 (5th Cir. 1992).

Substantial evidence does not support the ALJ's finding that Jeansonne's vision impairment is "not severe."  The ALJ did not include Jeansonne's vision impairment in her residual functional capacity assessment or in her hypotheticals to the VE.

According to the Dictionary of Occupational Titles ("DICOT") such jobs as assembly line worker and dispatcher, jobs the VE found Jeansonne can perform, do not require far acuity.  For example, see Factory Helper, DICOT No. 529.686-034, Robotic Machine Operator, DICOT No. 606.382-026, Sorter, DICOT No. 706.587-014, Assembler, DICOT No. 706.687-101, Assembly Line Inspector, DICOT No. 709.684-018, Assembly Loader, DICOT No. 711.684-010, Boat Dispatcher, DICOT No. 184.167-010, Dispatcher DICOT No., Chief I, DICOT No. 184.167-038, Superintendent, Transportation, DICOT No. 184.167-226, Dispatcher, DICOT No. 193.262-014.

However, as discussed below, the case should be remanded to

the Commissioner for reevaluation of Jeansonne's residual functional capacity. Therefore Jeansonne's vision impairment should be included in his list of "severe impairments" and factored into his residual functional capacity on remand.

2.

Next, Jeansonne contends the ALJ failed to consider medical evidence of his severe respiratory and cardiovascular impairments. The ALJ relied to some extent on Dr. Levings' evaluation of Jeansonne (Tr. pp. 20-21, 290-291). Dr. Levings stated Jeansonne needed to undergo further testing to determine whether his chest pain is related to his pulmonary problems, or whether it had a different etiology, as indicated by the right bundle branch block. Although Jeansonne's pulmonary problems were considered by the ALJ in determining Jeansonne's residual functional capacity (Tr. p. 21), his cardiac problems were not mentioned despite the fact that the ALJ found Jeansonne suffers from coronary artery disease and Jeansonne testified he has chest pain (Tr. pp. 17, 308).

The Commissioner has the burden to establish a claimant's residual functional capacity. Leggett v. Chater, 67 F.3d 558, 565 (5th Cir. 1995). The ALJ must perform a "function-by-function" assessment of the claimant's ability to engage in work-related activities when making his RFC determination. SSR 96-8p. When making the RFC determination an ALJ must consider objective medical facts, diagnoses and medical opinion based on such facts, and subjective evidence of pain or disability testified to by the claimant or others. 20 C.F.R. § 404.1545(a). Moreover, the ALJ

19

must specify the evidentiary basis for his RFC determination.  SSR 96-8p.  Myers v. Apfel, 238 F.3d 617, 620 (5th Cir. 2001).

The Fifth Circuit has consistently held that once the ALJ determines that a claimant suffers from a nonexertional impairment that prevents him from performing his past relevant work, the Commissioner must produce expert vocational testimony or other similar evidence to establish that other jobs exist in the national economy that the claimant can perform.  Fields v. Bowen, 805 F.2d 1168, 1170 (5th Cir. 1986), and cases cited therein.

The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.  A vocational expert is able to compare all the unique requirements of a specified job with the particular ailments a claimant suffers in order to reach a reasoned conclusion whether the claimant can perform the specific job.  Fields, 805 F.2d at 1170.  Therefore, unless the hypothetical question posed to the vocational expert by the ALJ can be said to incorporate reasonably all disabilities of the claimant recognized by the ALJ, and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions, a determination of non-disability based on such a defective question cannot stand.  Boyd v. Apfel, 239 F.3d 698, 706-707 (5th Cir. 2001), citing Bowling v. Shalala, 36 F.3d 431, 436 (5th Cir. 1994).

In the case at bar, the ALJ failed to consider the effect, if

any, of Jeansonne's chest pain and coronary artery disease on his residual functional capacity.  The ALJ's hypothetical questions to the VE were defective because they were premised on an inaccurate residual functional capacity assessment.  Since the hypothetical questions to the VE were defective, substantial evidence does not support the ALJ's finding that Jeansonne can perform some types of sedentary work.  Jeansonne's case should be remanded for reconsideration of his residual functional capacity, including his coronary artery disease.

3.

Jeansonne also contends the ALJ erred in failing to find his combination of impairments meets or medically equals a listing for cardiovascular impairments under Section 4.00 or for pulmonary impairments under Section 3.00.  A claimant has the burden of proving that his condition meets or equals an impairment listed in Appendix 1.  Sullivan v. Zebley, 493 U.S. 521, 110 S.Ct. 885, 891-92, 107 L. Ed. 2d 967 (1990).  Also, Selders v. Sullivan, 914 F. 2d 614, 619(5th Cir. 1990).  Jeansonne has not shown how he meets a specific listing under Sections 3.00 and 4.00 Appendix 1 of Pt. 404, Subpt. P.  However, Jeansonne's pulmonary function studies (Tr. pp. 232-237) do not show that he meets any of the listings under Listing Section 3.00.  Moreover, Jeansonne has not shown that he meets the listings for coronary artery disease because he does not have "very severe limitations in the ability to independently initiate, sustain, or complete activities of daily living," as required by Listing 4.04(C)(2).  Therefore, this claim is

meritless.

4.

Jeansonne also claims the ALJ failed to consider the cumulative effect of his obesity on his cardiovascular impairment. Although the ALJ stated that she considered the effects of Jeansonne's obesity on his residual functional capacity, she did not consider Jeansonne's coronary artery disease when she assessed his residual functional capacity. Since the ALJ failed to evaluate his coronary artery disease in conjunction with his obesity, as required by Section 4.00(I)(1), the ALJ's residual functional capacity determination was incomplete and her hypothetical questions to the VE were defective. Therefore, substantial evidence does not support the ALJ's conclusion that Jeansonne can perform some types of sedentary work. Jeansonne's case should be remanded to the Commissioner for further consideration.

## Issue No. 2 - VE's Findings

Jeansonne also argues the VE's testimony cannot constitute substantial evidence of non-disability because it was based on defective hypothetical questions posed by the ALJ. Specifically, Jeansonne contends the ALJ's hypothetical question to the VE failed to incorporate the mental limitations recognized by the ALJ in her decision - moderate limitations in activities of daily living, moderate difficulties maintaining social functioning, and moderate difficulties maintaining concentration, persistence, and pace.

The ALJ found Jeansonne has moderate limitations maintaining concentration, persistence, and pace *for complex tasks,*

significantly qualifying those limitations (Tr. p. 18).  The ALJ's
hypothetical to the VE specified that the claimant can follow
*short, simple instructions* and can maintain concentration and
persistence (Tr. pp. 355-356).  Therefore, the VE's inclusion in
the hypothetical that Jeansonne can maintain "concentration and
persistence" when following short, simple instructions (rather than
complex tasks) is not inconsistent with her finding that he has
moderate limitations in concentration, persistence, and pace for
complex tasks.

Jeansonne further contends the jobs which the VE found he can
perform are all semi-skilled work, although the ALJ found he has no
transferable work skills.  Social Security Ruling 82-41 (Program
Policy Statement PPS-67) defines a "skill" as follows:

> 2.a.  What a "skill" is.  A skill is knowledge of a
> work activity which requires the exercise of significant
> judgment that goes beyond the carrying out of simple job
> duties and is acquired through performance of an
> occupation which is above the unskilled level (requires
> more than 30 days to learn).  It is practical and
> familiar knowledge of the principles and processes of an
> art, science or trade, combined with the ability to apply
> them in practice in a proper and approved manner.  This
> includes activities like making precise measurements,
> reading blueprints, and setting up and operating complex
> machinery.  A skill gives a person a special advantage
> over unskilled workers in the labor market.
> Skills are not gained by doing unskilled jobs, and
> a person has no special advantage if he or she is skilled
> or semiskilled but can qualify only for an unskilled job
> because his or her skills cannot be used to any
> significant degree in other jobs.

Also, 20 C.F.R. § 404.1568(d) provides in pertinent part:

> (1) What we mean by transferable skills. We consider you
> to have skills that can be used in other jobs, when the
> skilled or semi-skilled work activities you did in past
> work can be used to meet the requirements of skilled or
> semi-skilled work activities of other jobs or kinds of

work. This depends largely on the similarity of occupationally significant work activities among different jobs.
(2) How we determine skills that can be transferred to other jobs. Transferability is most probable and meaningful among jobs in which--
(I) The same or a lesser degree of skill is required;
(ii) The same or similar tools and machines are used; and
(iii) The same or similar raw materials, products, processes, or services are involved.
(3) Degrees of transferability. There are degrees of transferability of skills ranging from very close similarities to remote and incidental similarities among jobs. A complete similarity of all three factors is not necessary for transferability. However, when skills are so specialized or have been acquired in such an isolated vocational setting (like many jobs in mining, agriculture, or fishing) that they are not readily usable in other industries, jobs, and work settings, we consider that they are not transferable."

Also, in Social Security Ruling 82-41, 1982 WL 31389, *2

(S.S.A.), the SSA explained transferability:

"What 'transferability' is. Transferability means applying work skills which a person has demonstrated in vocationally relevant past jobs to meet the requirements of other skilled or semiskilled jobs. Transferability is distinct from the usage of skills recently learned in school which may serve as a basis for direct entry into skilled work (Appendix 2, section 201.00(g)).

"Where transferability is at issue, it is most probable and meaningful among jobs in which: (1) the same or a lesser degree of skill is required, because people are not expected to do more complex jobs than they have actually performed (i.e., from a skilled to a semiskilled or another skilled job, or from one semiskilled to another semiskilled job); (2) the same or similar tools and machines are used; and (3) the same or similar raw materials, products, processes or services are involved. A complete similarity of all these factors is not necessary. There are degrees of transferability ranging from very close similarities to remote and incidental similarities among jobs." [Emphasis added.]

SSR 82-41, 1982 WL 31389, *5 (S.S.A.). See also, Huff v. Shalala,

1994 WL 776889, *3 (S.D.Miss. 1994), citing Thornton v. Heckler,

609 F.Supp. 1185, 1189 (E.D.N.Y. 1985).

The VEs at both hearings testified that Jeansonne's past relevant work as a survey rod man was semi-skilled work (Tr. pp. 327, 350).  The VE at the first hearing testified that Jeansonne did not have any transferable skills (Tr. p. 328).  The ALJ found that transferability of skills was not an issue because the Medical-Vocational Guidelines support a finding that the claimant is "not disabled" regardless of whether his work skills are transferable (Tr. p. 21).  In the hypothetical question to the VE in the second hearing, the ALJ stated that transferability of skills was not an issue (Tr. p. 355).  The VE then listed semi-skilled, sedentary jobs.

Since the VE found jobs which are semi-skilled, the transferability of skills or the ability to be trained in a skill is an issue.  The ALJ failed to identify what skills Jeansonne has and what skills he would need for the semi-skilled sedentary jobs identified by the VE.  The ALJ's hypothetical to the VE was defective because it did include consideration of whether Jeansonne will be able to acquire the skills and make the vocational adjustment necessary to perform the semi-skilled work listed by the VE.

Therefore, substantial evidence does not support the ALJ's conclusion that Jeansonne can perform other work which exists in significant numbers in the regional and national economies. Jeansonne's case should be remanded for further consideration of transferability of his work skills and the work skill required in new work he could perform.

25

Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be REVERSED AND VACATED and that Jeansonne's case be REMANDED to the Commissioner for further proceedings consistent with the opinions expressed herein.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 25th day of April, 2008.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE